## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**IN THE MATTER OF THE SEIZURE OF THE USDT TOKENS CURRENTLY ASSOCIATED WITH THE FOLLOWING VIRTUAL CURRENCY ADDRESSES:**

TQcSvY5agUA8CT9EjyNieJpkyYqPVGTRCS;
TXDvEMpGWea431VLG4Kii4L7uH6XxZ85Yr;
TLDat8TwRXFdDnKj4ZaVEJLBjxaU385KYY;
TDyfYWyoZSnw9S1jyDtzH4dtnkDAKzcYyY;
TCsgiLEJ4ccuB4qix6JfbZD64vGic5mAz7;
THds4ePLpkCTYU6FJQFEaH3SExEj5ufKNC;
TRd8YvxRzKoqQDPdh6DpE8T7r6VfZNJYtN;
TRDdkWjqaH3YPoXTu19ZTB1QNAXnKTNhHg

____ FILED ____ ENTERED
____ LOGGED ____ RECEIVED

9:02 am, Jul 20 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ R.C. _____ Deputy

Case No. 1:26-mj-01430-CJC

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Laura J. Steinbach, being duly sworn, depose and state:

### INTRODUCTION AND AGENT'S BACKGROUND

1. I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other FBI personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2014. I am currently assigned to a squad in the Baltimore Division

responsible for investigating complex financial crimes such as mail fraud, wire fraud, financial institution fraud, and money laundering. I have prepared and executed multiple search, arrest, and seizure warrants. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.      This affidavit is made in support of an application for a warrant authorizing the seizure of the USDT tokens associated with the virtual currency address "TQcSvY5agUA8CT9EjyNieJpkyYqPVGTRCS", herein referred to as "**TARGET PROPERTY 1**", the seizure of the USDT tokens associated with the virtual currency address "TXDvEMpGWea431VLG4Kii4L7uH6XxZ85Yr", herein referred to as "**TARGET PROPERTY 2**", the seizure of the USDT tokens associated with the virtual currency address "TLDat8TwRXFdDnKj4ZaVEJLBjxaU385KYY", herein referred to as "**TARGET PROPERTY 3**", the seizure of USDT tokens associated with the virtual currency address "TDytYWyoZSnw9S1jyDtzH4dtnkDAKzcYyY", herein referred to as "**TARGET PROPERTY 4**", the seizure of the USDT tokens associated with the virtual currency address "TCsgiLEJ4ccuB4qix6JfbZD64vGic5mAz7", herein referred to as "**TARGET PROPERTY 5**", the seizure of the USDT tokens associated with the virtual currency address "THds4ePLpkCTYU6FJQFEaH3SExEj5ufKNC", herein referred to as "**TARGET PROPERTY 6**", the seizure of the USDT tokens associated with the virtual currency address "TRd8YvxRzKoqQDPdh6DpE8T7r6VfZNJYtN", herein referred to as "**TARGET PROPERTY 7**", and the seizure of the USDT tokens associated with the virtual currency address , "TRDdkWjqaH3YPoXTu19ZTB1QNAXnKTNhHg", herein referred to as "**TARGET**

**PROPERTY 8"**, as proceeds of or involved in violations of, inter alia, 18 U.S.C. §§ 1343 and 1956(a)(1)(B)(i), subject to criminal and civil forfeiture.

## APPLICABLE LAW

5.      This Court has jurisdiction to issue the requested warrants to seize property in **TARGET PROPERTY 1, TARGET PROPERTY 2, TARGET PROPERTY 3, TARGET PROPERTY 4, TARGET PROPERTY 5, TARGET PROPERTY 6, TARGET PROPERTY 7, and TARGET PROPERTY 8** because it is proceeds of violations of, *inter alia*, wire fraud, in violation of 18 U.S.C. § 1343, and/or involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and as such is subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a) (criminal forfeiture), and 18 U.S.C. § 981(a)(1) (civil forfeiture).

6.      Title 18, United States Code, Section 1343 (wire fraud) provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense.

7.      Title 18, United States Code, Section 1956(a)(1)(B)(i) (laundering of monetary instruments with intent to conceal) provides that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified

unlawful activity" shall be guilty of a federal offense. Wire fraud is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).

8.     The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that "if a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain a forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

9.     Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which includes the actual property laundered and property used to facilitate the laundering offense. *See United States v. McKinney*, No. 07-0113-01 (RBW), 2009 WL 10701319 at *7 (D.D.C. Mar. 26, 2009) ("property that may be used to facilitate a money laundering violation includes money in financial accounts, personal property, real property, and businesses"); *see also United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999) (explaining that

untainted funds that are comingled with tainted funds derived from illicit sources may constitute a facilitating property).

10.    This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could otherwise be placed beyond the Government's reach. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement," if there is probable cause to believe that the property is subject to forfeiture. Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign jurisdiction. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## PROBABLE CAUSE

### Background on Relevant Cryptocurrency Entities and Concepts

#### Cryptocurrencies and Transaction Analysis

11.    Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and

receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet. The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

12.    Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

13.    Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

14.    Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I also know that this shared use of information is very often the same person or a close and trusted group working in concert.

15.     Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts.  However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions.  Fraudsters may attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the United States.

16.     Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, in order to attempt to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

Stablecoins

17.     **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

18.     **USDC:** Circle Internet Financial Limited ("Circle") is a peer-to-peer payments technology company that manages USDC tokens (a stablecoin).

19.     **Tether (USDT):** Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT tokens (a stablecoin). In the

instant case, at the request of law enforcement, Tether acted to freeze/blacklist the USDT associated with **TARGET PROPERTY 1, TARGET PROPERTY 2, TARGET PROPERTY 3, TARGET PROPERTY 4, TARGET PROPERTY 5, TARGET PROPERTY 6, TARGET PROPERTY 7,** and **TARGET PROPERTY 8** between approximately 4/26/2026-5/8/2026 and have indicated that they will continue to do so until they receive the instant warrant.

### Cyber Enabled Cryptocurrency Investment Fraud Defined

20.    The FBI is investigating a cyber enabled cryptocurrency investment fraud scheme, often colloquially referred to as "pig-butchering." "Pig-butchering" schemes begin by criminals contacting potential victims through seemingly misdirected text messages, dating applications, professional meetup groups, or other online forums. Next, using various means of manipulation and social engineering, the criminal gains the victim's affection and/or trust.

21.    Once that trust is established, the criminal recommends cryptocurrency investment by touting their own, or an associate's, success in the field. Means of carrying out the scheme vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject assists the victim with opening a cryptocurrency account, often on a U.S.-based exchange such as Coinbase, and then walks the victim through transferring money from a bank account to that cryptocurrency account. Next, the victim will receive instructions on how to transfer their cryptocurrency assets to the fake investment platform. On its surface, the platform shows lucrative returns, encouraging further investment; underneath, all deposited funds are routed to a cryptocurrency wallet address controlled completely by the criminals. The fraud scheme is typically executed as follows:



22.     Fraudsters frequently allow victims to withdraw some of their "profits" early in the scheme to engender trust and help convince victims of the legitimacy of the platform. As the scheme continues, victims are unable to withdraw their funds and are provided various excuses as to why. For example, the criminals will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by the criminals to elicit more money from victims. Ultimately, victims are locked out of their accounts and lose virtually all their funds.

23.     The cryptocurrency ecosystem is used by criminals not only to receive victim money, but to launder it quickly, anonymously, and at scale. Like traditional money-laundering, laundering money through cryptocurrency shares the same three stages of placement, layering, and integration, with different techniques applied within each stage:

a. **Placement**- Criminals use non-custodial, or "private" wallets to initially receive victim funds. This is because such wallets are unattributable to law-enforcement by

blockchain analysis alone, are simple to create, and can accept large transaction amounts without additional scrutiny.

b. **Layering**- Next, criminals will have victim funds transverse numerous private wallets, consolidate with other illegitimate and legitimate funds, and be subjected to other more cryptocurrency-specific processes to obfuscate both the origin of, and the ultimate destination for, the victim funds.

c. **Integration**- Finally, by using a diffuse network of "brokers," who agree to exchange cryptocurrency for fiat currency using various means, criminals render their proceeds liquid and fully integrated with the legitimate financial system.

### Victim 1

24.     Victim 1 is a resident of Annapolis, MD. Victim 1 met an individual who stated his named was "FRANK TRAPP" on Tinder in June 2025. Tinder is an online dating application. "FRANK" initially sent Victim 1 a message on TINDER on 6/16/2025 and asked Victim 1 to move all communication to WhatsApp shortly thereafter. The conversations between Victim 1 and "FRANK" were romantic in nature. Victim 1 believed that "FRANK" could be a potential partner.

25.     "FRANK" told Victim 1 that he was originally from Austria, but was living in Baltimore, MD. "FRANK" stated that he was in the drone business and traveled a lot for work. Victim 1 communicated with "FRANK" through WhatsApp messaging. Victim 1 never met "FRANK" in person and never communicated through FaceTime.

26.     Victim 1 only spoke with "FRANK" over the phone on one occasion. The phone call occurred when Victim 1 told "FRANK" that she was planning on being in Baltimore and asked

"FRANK" if he could meet in person. "FRANK" called Victim 1 over the phone and said that he was unable to meet up and did not like talking over the phone because he had a thick accent.

27. On 7/15/2025, Victim 1 received a message from WhatsApp number (646) 245-6951. The message stated that it was "FRANK" and that he had to reach out to Victim 1 from a new phone number because his phone was stolen out of a car when he was at a gas station.

28. Eventually, "FRANK" began to discuss investing in cryptocurrency with Victim 1 and encouraged Victim 1 to send funds to a cryptocurrency platform. Victim 1 transferred approximately $3,200,000 from her Bank of America checking account to Coinbase, and then sent funds to the cryptocurrency platform at "FRANK's" direction. "FRANK" provided Victim 1 with the URL "https://m.dovmkb.com" and with screenshots on how to conduct the transactions. At one point in time, "FRANK" advised Victim 1 that he sent $200,000 of his own funds to Victim 1's account on the investment platform.

29. The approximate $3,200,000 Victim 1 sent at the direction of "FRANK" was proceeds from a divorce settlement Victim 1 recently received. Victim 1 had planned to use the funds to purchase a new home for her and her children. Victim 1 realized that she was a victim of a scam when she attempted to withdraw funds from the investment platform and was met with requests to send additional funds.

## CRYPTOCURRENCY TRACING ANALYSIS

30. Between July 18, 2025, through April 16, 2026, approximately $3.2 million of virtual currency was sent from VICTIM 1's Coinbase account to addresses 0xc46E06dA5EcD39e510fe9bB95285b4C7CF49d0a0 ($3,009,726) and 0xf7961C5F5970F3987f5F5d2A633B27ee8A62Ee88 ($219,393). These funds were transferred through a series of addresses and sent to either Bridgers, a decentralized cross-

chain swap service, or Tokenlon, a decentralized exchange. Bridgers and Tokenlon can be used to swap one type of cryptocurrency for another. VICTIM 1's funds were then converted to USDT on the Tron network and sent to the below target properties.

## TARGET PROPERTY 1

31.     On November 25, 2025, $1,021,603 in USDC was sent from VICTIM 1's Coinbase account to address "...49d0a0". These funds were transferred through a series of addresses and sent to Bridgers where they were converted to USDT and sent to **TARGET PROPERTY 1** on February 1, 2026 as follows:



## TARGET PROPERTY 2

32.     On October 1, 2025, $299,936 in USDC was sent from VICTIM 1's Coinbase account to address "...49d0a0". These funds were transferred through a series of addresses,

including multiple swaps through Tokenlon, and eventually sent to Bridgers where they were converted to USDT and sent to **TARGET PROPERTY 2** on March 25, 2026 as follows:



## TARGET PROPERTY 3

33.     On November 25, 2025, $1,021,603 in USDC was sent from VICTIM 1's Coinbase account to address "...49d0a0". These funds were transferred through a series of addresses and sent to Bridgers where they were converted to USDT and sent to **TARGET PROPERTY 3** on March 25, 2026 as follows:



## TARGET PROPERTY 4

34.     On April 16, 2026, $69,992 in USDC was sent from VICTIM 1's Coinbase account to address "...62Ee88". These funds were transferred through a series of addresses and sent to Bridgers where they were converted to USDT and sent to **TARGET PROPERTY 4** on April 27, 2026 as follows:



## TARGET PROPERTY 5 & TARGET PROPERTY 6

35.     On November 25, 2025, $1,021,603 in USDC was sent from VICTIM 1's Coinbase account to address "...49d0a0". These funds were transferred through a series of addresses and sent to Bridgers where they were converted to TRON.  The funds were then converted to USDT at Bridgers and sent to **TARGET PROPERTY 5** on May 1, 2026 & **TARGET PROPERTY 6** on May 1, 2026 as follows:



## TARGET PROPERTY 7

36.     On January 6, 2026, $829,752 in USDC was sent from VICTIM 1's Coinbase account to address "...49d0a0". A portion of these funds were transferred directly to Bridgers, converted to USDT and sent to **TARGET PROPERTY 7** on January 10, 2026 as follows:



## TARGET PROPERTY 8

37.     On November 25, 2025, $1,021,603 in USDC was sent from VICTIM 1's Coinbase account to address "...49d0a0". These funds were transferred through a series of addresses and sent to Bridgers where they were converted to TRON. The funds were then converted to USDT at Bridgers and sent to **TARGET PROPERTY 8** on May 8, 2026 as follows:



| WALLET LAST 6 DIGITS | AMOUNT | WALLET LAST 6 DIGITS |
|---|---|---|
| EH Coinbase Account | $1,021,603 ⟹ | "...49d0a0" |
| "...49d0a0" | $1,021,540 ⟹ | "...23f359" |
| "...23f359" | $299,990 ⟹ | "...30BEf0" |
| ...30BEf0 | $299,964 ⟹ | BRIDGERS.XYZ |
| BRIDGERS.XYZ | $298,339 ⟹ | "...ikmQ3F" |
| "...ikmQ3F" | $298,357 ⟹ | BRIDGERS.XYZ |
| BRIDGERS.XYZ | $97,538 ⟹ | "...zGrDif" |
| "...zGrDif" | $104,075 ⟹ | "...XwgALy" |
| "...XwgALy" | $104,070 ⟹ | BRIDGERS.XYZ |
| BRIDGERS.XYZ | $103,256 ⟹ | "...XwgALy" |
| "...XwgALy" | $103,637 ⟹ | TARGET PROPERTY 8 |

## CONCLUSION

38.     This affidavit seeks seizure of the equivalent amount of USDT tokens currently associated with **TARGET PROPERTY 1, TARGET PROPERTY 2, TARGET PROPERTY 3, TARGET PROPERTY 4, TARGET PROPERTY 5, TARGET PROPERTY 6, TARGET PROPERTY 7,** and **TARGET PROPERTY 8.** Based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial accounts, sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The blockchain analysis in this case demonstrates this; it shows the movement of the victim money, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to conceal the nature, source, location, ownership and control of the proceeds. *See, e.g., United States v. Rodriguez,* 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source).

39.     Based on the forgoing, I submit that there is probable cause to believe the funds held in **TARGET PROPERTY 1, TARGET PROPERTY 2, TARGET PROPERTY 3, TARGET PROPERTY 4, TARGET PROPERTY 5, TARGET PROPERTY 6, TARGET PROPERTY 7,** and **TARGET PROPERTY 8** in any form, are proceeds of, or traceable to proceeds of violations of, inter alia, 18 U.S.C. §1343 (Wire Fraud), and/or are involved in violations of, inter alia, 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), and therefore subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).

40.    Further, because the requested warrants would be executed by serving electronically to Tether, I respectfully submit that there is good cause to permit the execution of the warrants at any time, day or night.

Special Agent Laura Steinbach
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ____9th____ day of June 2026.



The Honorable Chelsea J. Crawford
United States Magistrate Judge